# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### OWENSBORO DIVISION

**CIVIL ACTION NO. 4:09-CV-00094-M**

**GROUPWELL INTERNATIONAL (HK) LIMITED**  **PLAINTIFF**

**V.**

**GOURMET EXPRESS, LLC**  **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on: (1) Groupwell's Fourth Motion for Partial Summary Judgment [DN 153]; (2) Groupwell's Fifth Motion for Partial Summary Judgment [DN 158]; and (3) Groupwell's Motion for Leave to File a Reply Brief in Excess of 15 Pages [DN 163]. Fully briefed, this matter is ripe for decision. For the following reasons, Groupwell's fourth and fifth motions for partial summary judgment, and its motion for leave, are **GRANTED**.

## I. BACKGROUND[1]

This controversy arises out of a dispute between Groupwell, a seller of frozen seafood and vegetables, and Gourmet, a manufacturer of frozen dinners. In September of 2009, Groupwell filed suit against Gourmet, alleging breach of contract. Groupwell alleges that Gourmet owes it money for shrimp and vegetables that Gourmet purchased in 2009. (Compl. [DN 1] ¶¶ 5-10.) In February of 2010, Groupwell filed an Amended Complaint. (Am. Compl. [DN 14].) Gourmet then filed its Second Amended Answer and Counterclaims against Groupwell. Gourmet alleges that Groupwell, along with former Gourmet executives Robert Scully and Kevin Scully, conspired to overcharge Gourmet for products through the use of fraudulent invoices. According to Gourmet, the Scullys would approve fraudulent invoices and cause Gourmet to pay them. The

---

[1] These facts are taken in the light most favorable to the non-movant, Gourmet.

overcharge that was received by Groupwell was then redistributed in the form of a kickback to the Scullys and their family members. (Ver. 2d Am. Ans. to Am. Compl. & Countercls. [DN 49].)

The factual basis underlying Gourmet's Second Amended Answer and Counterclaims is largely based on an indictment that was issued against the Scullys in the U.S. District Court for the Western District of Texas on July 7, 2010. The indictment claimed that Groupwell was a "shell company" controlled by the Scullys—and that the Scullys, through their control of Groupwell, overcharged Gourmet for shrimp, retained the overcharge, and did not report it as income. (See Indictment [DN 44-2].) A superseding indictment was issued against the Scullys on November 17, 2010. This indictment added counts of conspiracy to commit fraud and wire fraud. It also added a demand for forfeiture. (See Superseding Indictment [DN 153-2].) On October 16, 2013, a second superseding indictment was issued. Along with eliminating any charges against Kevin Scully, who died in June of 2013, this indictment claimed that the Scullys hid Nataporn Phaengbutdee's interest in Groupwell from Gourmet's co-owners. Phaengbutdee is Robert Scully's sister-in-law and the owner of Groupwell. (See 2d Superseding Indictment [DN 153-3].)

On March 2, 2011, in this lawsuit, Groupwell moved for partial summary judgment based on the releases contained in a Settlement Agreement and the res judicata effect of an Agreed Order of Dismissal. (Pl.'s 2d Mot. for Partial Summ. J. [DN 55].) The Court denied that motion based on ambiguities in the Settlement Agreement and the inapplicability of the doctrine of res judicata with respect to the Agreed Order. (Mem. Op. & Order [DN 70].) Later, on Groupwell's motion to bifurcate, the Court bifurcated the trial on the parties' intent regarding the Settlement Agreement and ordered that discovery be limited to issues concerning intent. The Court stayed Groupwell's obligations to respond to discovery on Gourmet's fraud allegations. (Order [DN 83].)

Groupwell then moved for partial summary judgment based on the res judicata effect of a different order—namely, a bankruptcy court's order of January 23, 2008. (See Pl.'s 3d Mot. for Partial Summ. J. [DN 90].) On January 25, 2013, the Court granted this motion, holding that Gourmet failed to adequately reserve its claims in its prior bankruptcy proceeding and, due to the effect of res judicata, Gourmet was barred from asserting claims arising before January 23, 2008, the date the bankruptcy court entered an order confirming Gourmet's plan of reorganization. (See Mem. Op. & Order [DN 110].) Groupwell has now filed two additional motions for partial summary judgment. Its fourth motion [DN 153] seeks dismissal of Gourmet's counterclaims [DN 49]. Its fifth motion [DN 158] seeks relief on the claims asserted in its Amended Complaint [DN 16]. The Court will consider each of Groupwell's motions below.

## II. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, the non-moving party must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that

the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

### III. DISCUSSION

#### GROUPWELL'S FOURTH MOTION FOR PARTIAL SUMMARY JUDGMENT [DN 153]

Gourmet asserts five counterclaims against Groupwell: (1) fraud; (2) civil conspiracy; (3) money paid by mistake; (4) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); and (5) conspiracy to violate RICO. (Ver. 2d Am. Ans. to Am. Compl. & Countercls. [DN 49].) In its motion for partial summary judgment, Groupwell argues that the Court must dismiss each of Gourmet's counterclaims because Gourmet has not provided evidence of any actionable conduct by Groupwell occurring after January 23, 2008. (Pl.'s Mem. in Supp. of its 4th Mot. for Partial Summ. J. [DN 153-1].) The Court considers each counterclaim in turn.[2]

#### A.     Fraud

Kentucky courts have long held that a plaintiff asserting a fraud claim "must establish six elements . . . by clear and convincing evidence as follows: a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury." United Parcel Serv. Co. v. Rickert, 996 S.W.2d 464, 468 (Ky. 1999). In its counterclaim, Gourmet alleges that through certain "actions, statements and [the] course of conduct by its employees, officers and other authorized agents, Groupwell misrepresented its true owners, managers, and controlling persons to Gourmet . . . ." (Ver. 2d Am. Ans. to Am. Compl. & Countercls. [DN 49] ¶ 65.) Gourmet also alleges that Groupwell

---

[2] As this case is based on diversity jurisdiction, the Court will analyze the parties' claims under Kentucky law. See Himmel v. Ford Motor Co., 342 F.3d 593, 598 (6th Cir. 2003) (noting that in diversity cases, federal courts normally "apply the law, including the choice of law rules, of the forum state").

made false representations to Gourmet regarding "the cost of food product." (Id. ¶¶ 66-67.) In its partial summary judgment motion, Groupwell argues that Gourmet's fraud claim fails because: (1) the evidence shows that Groupwell never made any misrepresentation to Gourmet regarding its "true owners"; and (2) the evidence shows that Groupwell never made any misrepresentation to Gourmet regarding the "cost" it paid for its food product. (Pl.'s Mem. [DN 153-1] 4-5, 24-26.)

**Representation about Groupwell's "True Owners."** Groupwell asserts that Gourmet's fraud claim fails because Gourmet cannot identify any misrepresentation Groupwell made about its "true owners, managers, and controlling persons." (Pl.'s Mem. [DN 153-1] 24-25.) In its response to Groupwell's Third Set of Interrogatories and Requests for Production of Documents, Gourmet stated that the Scullys, Didier Delaval (a shareholder and consultant of Groupwell, (see Didier Delaval Dep. [DN 153-22] 64)), and Nataporn Phaengbutdee made false representations concerning Groupwell's ownership to: (1) Gourmet's general manager, the Ilex Capital Group, LLC; (2) Gourmet's parent company, GEAF; and (3) certain of Gourmet's officers, purchasing agents, and bookkeeping agents. (See Resp. to Pl.'s 3d Set of Interrogs. & Requests for Prod. of Docs. [DN 153-4] 10-12.) Further, Gourmet stated that this response is based on the factual basis underlying the Scullys' superseding indictment. (Id.) In its partial summary judgment motion, Groupwell argues that Gourmet has failed to provide evidence in support of its position.

First, Groupwell argues that Gourmet's reliance on the superseding indictment no longer supports its fraud claim, as the second superseding indictment eliminated all allegations that the Scullys owned or controlled Groupwell. (See Pl.'s Mem. [DN 153-1] 6-7, 24-25; 2d Superseding Indictment [DN 153-3].) According to Groupwell, because Gourmet has failed to produce other evidence to support its fraud claim, the claim must be dismissed. (Id.) Second, Groupwell argues that while Gourmet has identified several alleged misrepresentations made by the Scullys, they

are not parties to this case—and Gourmet has already settled with them in regard to any such representations. (Id. at 6 (citing Richard Foster Dep. [DN 153-5] 55-56).) Groupwell argues that Gourmet has failed to highlight any representation made *by Groupwell*. Third, Groupwell argues that despite Gourmet's completion of extensive discovery, no other evidence has been discovered to support Gourmet's fraud claim. (Id. at 9-22.) As for the evidence, Groupwell highlights the deposition testimony of Bradley Jackson and Richard Foster in support of its arguments.

Bradley Jackson, the Chief Operating Officer of Gourmet, was hired by Gourmet in 2009. (Bradley Jackson Dep. [DN 153-11] 16.) In his deposition, Jackson testified that Gourmet's position is "that Keven Scully and Bob Scully had control over [Groupwell]." (Bradley Jackson Dep. [DN 153-11] 27.) Further, Jackson confirmed that the "basis of the company's position that Kevin and Bob Scully had control over Groupwell are the allegations made in the criminal case." (Id. at 28.) Richard Foster, by contrast, first became involved with Gourmet in 2007 through his ownership of Ilex, Gourmet's general manager. He stated in his deposition that Groupwell was a "shell company that was set up by Bob Scully and Kevin Scully in an effort to defraud the company. **That's what I know from the indictment.**" (Richard Foster Dep. [DN 153-5] 25 (emphasis added).) Foster stated that during his due diligence work before acquiring Gourmet, the Scullys assured him "time and time again that [Groupwell] was completely independent" and that "the only thing wrong with it was that his [sister-in-law, Nataporn Phaengbutdee] worked there." (Id. 26-27.) Groupwell argues that this testimony cannot support Gourmet's fraud claim.

According to Groupwell, while Jackson and Foster attempt to offer proof of Gourmet's fraud claim, they lack any personal knowledge of any misrepresentation *made by Groupwell.* Jackson and Foster base their deposition testimony on the Scullys' statements and the indictment. As for the Scullys' statements, Groupwell highlights that they are not parties to this case and that

Gourmet has settled with them in regard to any representations. As for the indictment, Groupwell argues that it is well-established that an indictment charges the defendant with acting or failing to act contrary to the law's command—but does not constitute "proof" of the commission of the offense. See Tot v. United States, 319 U.S. 463, 466 (1943); United States v. Crayton, 357 F.3d 560, 567 (6th Cir. 2004) (noting that evidence does not include the indictment itself because it is not evidence of guilt). Further, Groupwell reiterates that the second superseding indictment eliminated all allegations that the Scullys owned or controlled Groupwell. Groupwell thus states that Gourmet cannot rely on the testimony of Jackson or Foster to avoid summary judgment.

In response, Gourmet argues that material issues of fact exist concerning its fraud claim so as to preclude judgment under Fed. R. Civ. P. 56. Regarding the Scully-Groupwell scheme, Gourmet does not identify any particular representation. Instead, Gourmet argues that the "evidence developed shows that such a scheme was initially formulated in 2003/2004 and continued until mid-2009, when the Scullys were terminated by Gourmet." (Gourmet's Mem. in Supp. of its Resp. to Pl.'s 4th & 5th Mots. for Partial Summ. J. [DN 161-1] 3.) In support of this argument, Gourmet points to correspondence between Didier Delaval and Nataporn Phaengbutdee. In an e-mail dated September 22, 2007, Delaval forwarded an e-mail addressed to Groupwell from a consulting firm hired to assist in Gourmet's bankruptcy to Phaengbutdee, stating:

> Nat,
> Read the attached mail carefully.
> I do not know this guy.
> Have you heard of him?
> Is this a trap from our good friend Ken.
> Can you check? Ask Bob what I should do with this?
> I am back in Bkk all OK.
> I hope I have helped you and the group as per our expectations.
> I shall be in contact soonest.
> All the best
> Didier Delaval

(E-mail from Delaval [DN 59-5].) Delaval's ultimate response to the e-mail inquiry states:

> Hi Bob.
> Re. The court document issued Sep. 18.
> Do you want me to sign with N&D website to kill
> the idea of "Scully family companies"
> visit the site.
> ~~networkdevt@~~        www.networkdevt.com
> and just let me know. N&D opened in 1997.
> Cheers DD
> P.S. Besides N&DD Thailand never got involved in anything related.

(Id.) Gourmet states that these documents "clearly establish that both Groupwell and the Scullys were actively working in concert together to conceal the true nature of the Scully-Groupwell relationship . . . ." (Gourmet's Mem. [DN 161-1] 5.)

In addition, Gourmet argues that there is evidence that Groupwell acted under the direct control of the Scullys. In support of this argument, Gourmet notes that in the summer of 2009, it hired Bradley Jackson to work alongside the Scullys. Shortly thereafter, however, the Scullys terminated Jackson's employment. (See Bradley Jackson Dep. [DN 153-11] 16-20.)

Further, Gourmet argues that there is evidence of an improper relationship between the Scullys and Groupwell, as Nataporn Phaengbutdee affirmatively stated in her deposition that she sent in excess of $2,000,000.00 to the Scullys. (Nataporn Phaengbutdee Dep. [DN 153-31] 184-85.) Phaengbutdee stated that these payments were "investments," and payments for used farm equipment. (Id. at 178-185, 193-94.) Gourmet notes, however, that the alleged "investments" are not evidenced by any written agreement, discussed in any e-mail, or indicated on any deed or title to any property. (Id. at 181-83.) Also, Gourmet notes that Phaengbutdee is not able to describe the investment made by other investors, the value of the property purportedly invested, or the current value of her investment. (Id. at 178-84.) Finally, Gourmet notes that Phaengbutdee delivered the funds by first wiring them to Kevin Scully's relative, Mika Kon, who then wired

them to Kevin Scully's wife. (Id. at 178.) Gourmet argues that from these facts, a reasonable jury could find that "such evidence displays an agreement between Phaengbutdee and the Scullys to systematically and fraudulently deprive Gourmet of monies it otherwise would not have paid." (Gourmet's Mem. [DN 161-1] 12.)

It is undisputed that bank records show transfers from Groupwell's bank accounts to an account in the name of Mika Kon. The last transfer from a Groupwell bank account to Mika Kon or the Scullys occurred February 2, 2007. (See Pl.'s Mem. [DN 153-1] 22 (confirming the date of the transfer; Gourmet's Mem. [DN 161-1] 12 (noting that banking records confirm the existence of transfers from Phaengbutdee to the United States).) Gourmet argues that while the transactions were prior to January 23, 2008, the evidence "is relevant to show the development, implantation, and continuation of the Groupwell-Scully scheme." (Id. at 13.) Gourmet argues that nothing changed as to the relationship between Gourmet and Groupwell after January 23, 2008—and that a "material fact exists as to when the fraud stopped." (Id.) According to Gourmet, a reasonable jury could conclude that "an explanation as to why the Scullys did not receive money after January 2008 is that the ill-gotten gain that Groupwell would have otherwise received and distributed to the Scullys is the same money at issue in the instant litigation." (Id. at 13-14.)

The Court agrees with Groupwell that Gourmet's fraud claim fails, as Gourmet has not adequately identified any misrepresentation that Groupwell made concerning its "true owners, managers, and controlling persons." To the extent that Gourmet relies on the superseding indictment, its claim fails, as the second superseding indictment eliminated all allegations that the Scullys owned or controlled Groupwell, and indictments do not constitute proof of the commission of an offense. Likewise, to the extent Gourmet relies on alleged misrepresentations made by the Scullys, its claim fails, as the Scullys are not parties to this case, and Gourmet has

settled with them in regard to any such representations. Indeed, the only piece of evidence that Gourmet can cite to support its fraud claim relates to the money transfers from Nataporn Phaengbutdee to Kevin Scully's wife through Mika Kon's account. The Court finds that because these transfers occurred before January 23, 2008, however, they are irrelevant to the instant case. The transfers relied upon by Gourmet simply cannot support its fraud claim.

In this respect, the Court relies on <u>Sanderson v. HCA-The Healthcare Co.</u>, 447 F.3d 873 (6th Cir. 2006), which was cited by Groupwell in its reply brief. In that case, a hospital employee brought a *qui tam* action against his employer under the False Claims Act, alleging that the hospital engaged in a scheme to defraud the government through unlawful accounting practices. <u>Id.</u> at 875. The trial court dismissed the employee's claim because "the bare contention in the amended complaint that [the hospital's] allegedly fraudulent conduct continued after 1995 [the bar date under the applicable statute of limitations], based only upon 'information and belief,' was too 'vague and conclusory [to] rise to the heightened level of the requisite specificity under Rule 9(b)." <u>Id.</u> at 876. The Sixth Circuit affirmed this dismissal. <u>Id.</u> In so doing, it noted that the plaintiffs failed to describe "any fraudulent claims made during the statutory period" or "identify any applicable rule or regulation that was violated by [the hospital] since 1995." <u>Id.</u> In other words, the Sixth Circuit found that while the plaintiff identified activities that occurred outside the statutory period, his claim nonetheless failed, as he "failed to identify with specificity any fraudulent transfer or activity that occurred within the statutory period." <u>Id.</u> at 875.

Groupwell argues, and the Court agrees, that a similar conclusion is warranted here. In this case, Gourmet attempts to base its fraud claim on events and transactions that occurred before the January 23, 2008 *res judicata* bar date. As in <u>Sanderson</u>, Gourmet has essentially attempted to use instances **before** the bar date to establish that there was fraud **beyond** the bar

date. (See Gourmet's Mem. [DN 161-1] 3.) The Court finds that this is not permissible. In this case, Gourmet has put forth evidence of fraudulent activity occurring before January 23, 2008, in the form of the transfers and the e-mail correspondence. However, Gourmet only offers a mere inference that the fraudulent scheme continued after the bar date. Gourmet's argument that "a material fact exists as to when the fraud stopped" is incorrect, as Gourmet has failed to point to any fraudulent activity occurring after January 23, 2008. Gourmet's fraud claim is **DISMISSED** to the extent it is based on any alleged representations that Groupwell made concerning its "true owners, managers, and controlling persons."

**Representation about the "Cost" Paid by Gourmet.** Groupwell argues that Gourmet's fraud claim also fails because Gourmet cannot identify any misrepresentation regarding "the cost of food product." In its response to Groupwell's Third Set of Interrogatories and Requests for Production of Documents, Gourmet stated that Groupwell made misrepresentations regarding the "cost of food product" in "each and every invoice submitted to Gourmet by Groupwell." (Resp. to Pl.'s 3d Set of Interrogs. & Requests for Prod. of Docs. [DN 153-4] 12.) Gourmet also stated that the "amount owed [listed on each Groupwell invoice to Gourmet] was false," as the "amount owed indicated on each invoice included a portion of monies that were transferred to Robert Scully and Kevin Scully, or for their benefit or direction, unbeknownst to Gourmet." (Id. at 12-13.) According to Groupwell, the evidence does not support a finding that it made any material misrepresentation to Gourmet regarding the "cost of food product." (Pl.'s Mem. [DN 153-1] 25.) Instead, Groupwell states that its invoices only contain representations regarding the price that Groupwell charged Gourmet for the product identified therein. (Pl.'s Mem. [DN 153-1] 25.)

Moreover, regarding the price, Groupwell highlights that it was set by Gourmet. In her deposition, Phaengbutdee stated that the price was negotiated between her (on Groupwell's

behalf) and Kevin Scully (on Gourmet's behalf). (See Nataporn Phaengbutdee Dep. [DN 153-30] 70-75.) Richard Foster stated in his deposition that there were no limitations on the Scullys with respect to ordering and purchasing goods from suppliers, other than "protective provisions" in Gourmet's operating agreement. (Richard Foster Dep. [DN 153-5] 63-64.) Also, Bradley Jackson confirmed that the Scullys had vast authority to order and purchase ingredients for Gourmet. (Bradley Jackson Dep. [DN 153-11] 25.) Finally, Thomas Moreno, a master planner at Gourmet, stated that there was no limit on Kevin Scully's authority to purchase raw materials. (Thomas Moreno Dep. [DN 153-8] 6, 17.) Groupwell argues that these statements show that Groupwell never made any misrepresentation concerning the price it charged Gourmet. Instead, the price was set by Gourmet. (Pl.'s Mem. [DN 153-1] 25-26.) Groupwell states that Gourmet cannot identify any misrepresentation regarding "the cost of food product."

In response, Gourmet states that the evidence shows that Groupwell, in conjunction with the Scullys, "controlled the critical ingredient supply for all Gourmet product" and "conspired to cause Gourmet to purchase virtually all of its ingredients at a price completely controlled by them." (Gourmet's Mem. [DN 161-1] 11.) According to Gourmet, Phaengbutdee was never before or after in the food commodity sourcing business—and Groupwell had no customers other than Gourmet during the period of the Scullys' control. Therefore, Gourmet argues that "all Groupwell profit from every Gourmet order, including the Groupwell profit from January 23, 2008 forward, constitutes damage to Gourmet." (Id. at 12-13.)

Groupwell counters that Gourmet fails to explain how this could constitute damage under its fraud claim in light of the fact that Gourmet did not purchase goods based on any alleged material misrepresentation made by Groupwell. Also, Groupwell states that Gourmet fails to establish how Groupwell's "profits" constitute damage to Gourmet, as it has not produced any

evidence indicating that Groupwell's prices were not fair or commercially reasonable. In this respect, Groupwell highlights the deposition testimony of Thomas Moreno, who stated that while he does not recall when Gourmet changed to Groupwell as a supplier, he recalls that Gourmet became more profitable because Groupwell's price was cheaper than the previous supplier's price. (See Thomas Moreno Dep. [DN 153-8] 30-32.) Groupwell also highlights the deposition testimony of Eduardo Arevalo, who prepared purchase orders for Gourmet's purchases from Groupwell. He stated that in his opinion, Groupwell never charged Gourmet a price that was not commercially reasonable. (Eduardo Arevalo Dep. [DN 153-17] 33-34; id. [DN 153-19] 113.)

The Court agrees with Groupwell that Gourmet has not cited alleged misrepresentations by Groupwell regarding "the cost of food product." Groupwell's invoices clearly only contain representations regarding the price that Groupwell charged Gourmet for the product identified therein. Further, as noted above, to the extent that Gourmet argues that the amount owed listed on each Groupwell invoice was false because the amount included a portion of monies that were transferred to Robert Scully and Kevin Scully, Gourmet's claim is without merit, as it has failed to produce evidence of any kickback occurring after January 23, 2008. Gourmet's fraud claim is **DISMISSED** to the extent it is based on alleged representations that Groupwell made concerning "the cost of food product." This is especially true in light of the fact that Gourmet fails to point to any evidence that Groupwell's prices were not fair or commercially reasonable—and in light of the evidence showing that the Scullys, who were Gourmet representatives, set the prices at issue.

### B. Civil Conspiracy

Under Kentucky law, civil conspiracy is defined as "a corrupt or unlawful combination or agreement between two or more persons to do by concert of action an unlawful act, or to do a lawful act by unlawful means." Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co. LLC, 277

S.W.3d 255, 260–61 (Ky. App. 2008) (citation omitted). "[C]ivil conspiracy is not a free-standing claim; rather, it merely provides a theory under which a plaintiff may recover from multiple defendants for an underlying tort." <u>Stonestreet Farm, LLC v. Buckram Oak Holdings, N.V.</u>, 2010 WL 2696278, at *13 (Ky. App. July 9, 2010). In this case, Gourmet alleges in its counterclaim that there was a "corrupt and unlawful agreement" between Groupwell and other co-conspirators under which Groupwell "systematically caused intentionally inflated invoices to be delivered to Gourmet." (Ver. 2d Am. Ans. to Am. Compl. & Countercls. [DN 49] ¶ 74.) Gourmet alleges that it was "systematically overcharge[d] . . . for Groupwell's gain . . . ." (<u>Id.</u> ¶ 75.) In its summary judgment motion, Groupwell argues that there is no evidence to support this claim based on any conduct occurring after January 23, 2008. (Pl.'s Mem. [DN 153-1] 5, 26-27.) The Court agrees.

In this case, Gourmet clearly bases its civil conspiracy theory on the underlying tort of fraud. In its responses to Groupwell's Third Set of Interrogatories and Requests for Production of Documents, Gourmet stated that the civil conspiracy claim was based on the Scullys' receipt of "ill-gotten gains." (Resp. to Pl.'s 3d Set of Interrogs. & Requests for Prod. of Docs. [DN 153-4] 14.) Thus, Gourmet claims that the alleged kick-back scheme, with the money transfers from Phaengbutdee, is the conspiracy. This is evident from Gourmet's response to Groupwell's partial summary judgment motion, in which Gourmet argues that the evidence developed in this case "would permit a reasonable jury to determine that Groupwell and the Scullys conspired to cause Gourmet to purchase goods from Groupwell so that the Scullys could receive a portion of the proceeds of the price paid by Gourmet for the goods." (Gourmet's Mem. [DN 161-1] 14.) As noted above, however, the Court finds that Gourmet has failed to produce evidence pertaining to any event occurring after January 23, 2008 on which the jury could reasonably make a fraud

finding. Gourmet's civil conspiracy claim, therefore, cannot be based on the alleged kick-back scheme. The Court holds that Gourmet's civil conspiracy counterclaim is **DISMISSED**.

### C.    Money Paid by Mistake

Kentucky courts have held that "whenever, by a clear or palpable mistake of law or fact essentially bearing upon and affecting the contract, money has been paid without consideration, which in law, honor, or conscience was not due and payable, and which in honor or good conscience ought not to be retained, it may be and ought to be recovered." <u>Robertson v. Jefferson Cnty., Kentucky</u>, 266 S.W. 27, 28 (Ky. 1924). In other words, whenever money is paid pursuant to a contract in which an essential element is based on a mistake of law or fact, courts hold that such money is recoverable. In its counterclaim, Gourmet alleges that it paid Groupwell invoices "based upon the mistaken belief that all of its transactions with Groupwell were commercially reasonable and at arms-length, rather than being made to an entity improperly influenced by Gourmet's officers [i.e. the Scullys] and for the direct benefit of those officers . . . ." (Ver. 2d Am. Ans. to Am. Compl. & Countercls. [DN 49] ¶ 78.) In its summary judgment motion, Groupwell makes several arguments as to why Gourmet's money paid by mistake claim fails.

First, Groupwell argues that because the Scullys were authorized to order goods from Groupwell, and to pay Groupwell, there could not have been any payment made by mistake. (<u>See</u> Pl.'s Mem. [DN 153-1] 28.) In this respect, Groupwell cites to the deposition testimony of Foster, Jackson, and Moreno. Foster testified that there was no limitation on the Scullys' authority to order and purchase goods from suppliers, other than certain "protective provisions" in Gourmet's operating agreement. (Richard Foster Dep. [DN 153-5] 63-64.) Jackson testified that the Scullys had authority to order and purchase ingredients for Gourmet from 2004 until July 2009. (Bradley Jackson [DN 153-11] 25.) Moreno testified that Kevin Scully had authority to

order ingredients for Gourmet's meals. (Thomas Moreno Dep. [DN 153-8] 17-20.) Groupwell argues that this is a "fundamental problem" with Gourmet's claim. (Pl.'s Mem. [DN 153-1] 24.)

Second, Groupwell argues that while Gourmet claims that the transactions were not at "arms-length," a Gourmet representative, Eduardo Arevalo, has admitted in his deposition that in his opinion, Gourmet's transactions with Groupwell were commercially reasonable. (Eduardo Arevalo Dep. [DN 153-19] 112-13.) Further, Groupwell argues that Gourmet had full knowledge that Groupwell was owned by Nataporn Phaengbutdee, Robert Scully's sister-in-law. In this respect, Groupwell cites the deposition testimony of Joseph Matthews, who first became involved with Gourmet in 2007 or 2008 through his employment with Ilex. (Joseph Matthews Dep. [DN 153-14] 7, 13.) Matthews confirmed in his deposition that the membership interest purchase agreement between Groupwell and Gourmet disclosed that a relative by marriage of a Gourmet member worked at Groupwell and had a financial interest in it. (Id. at 42-43.)

Third, Groupwell argues that Gourmet's payment by mistake claim fails since Gourmet has not specified how much money it paid by mistake. (Pl.'s Mem. [DN 153-1] 28.) According to Groupwell, Gourmet admittedly received goods from Groupwell; thus, Groupwell is certainly owed some amount of money. Gourmet, however, has not specified the amount of overpayment made without consideration. Groupwell argues that Gourmet's allegations do not fit the usual parameters of a case of payment by mistake, which usually involves a mistake of fact as to the amount due, which results in an overpayment. See Robertson, 266 S.W. at 28; Allen Lumber Co. v. Howard, 72 S.W.2d 483 (Ky. 1934). Groupwell argues that the Court should dismiss Gourmet's claim since Gourmet attempts to classify its fraud claim as a payment by mistake claim.

In response to Groupwell's motion, Gourmet states that there is no dispute that from January 23, 2008 until April 22, 2009, it paid Groupwell the full value of Groupwell's invoices.

"In this way, Gourmet's claim for mistake on money paid is based upon it [*sic*] mistaken belief that it in fact was legally bound to pay Groupwell invoices from January 23, 2008 until April 22, 2009." (Gourmet's Mem. [DN 161-1] 16.) Gourmet argues that it mistakenly believed that it was paying an un-related third-party vendor in an arms-length transaction. According to Gourmet, no person at Gourmet was authorized to transact business that would violate the related-party protective provision of Gourmet's operating agreement. (<u>See</u> Richard Foster Dep. [DN 153-5] 63-64 (noting that there were "related party type" of provisions in the operating agreement)).

The Court finds that even in the light most favorable to Gourmet, the evidence does not support a finding that Gourmet "mistakenly believed" that it was paying an un-related third-party vendor in an arms-length transaction. In his deposition testimony, Foster stated that he does not recall any Groupwell representative making any representation to him regarding who owned or controlled Groupwell before Ilex acquired Gourmet in January 2008. (<u>Id.</u> at 35.) The only persons that assured him that there was no improper relationship between the Scullys and Groupwell were the Scullys. (<u>Id.</u> at 31.) Foster confirmed that he never had any conversations with Groupwell and that no representation of Groupwell ever made any misrepresentation to him. (Joseph Matthew Dep. [DN 153-14] 43; <u>id.</u> [DN 153-15] 69, 103.)

Further, the Court finds that the evidence shows that Ilex knew of Phaengbutdee and her ownership of Groupwell. The October 1, 2007 Membership Interest Purchase Agreement by which the Scullys sold their interest in Gourmet to GEAF disclosed the following:

> Related Party Transactions
> Schedule 4.17(a)
> . . .
> Gourmet purchases bulk products from an entity who employs a relative by marriage of member. This relative also has a financial interest in that entity.

(Schedule 4.17(a) [DN 163-2].)

Foster admitted that this provision pertained to Groupwell. (See Richard Foster Dep. [DN 153-5] 43.) This confirms the disclosure of Phaengbutdee's interest in Groupwell by at least October 1, 2007. Matthews also confirmed that he knew of no other person or entity to which Schedule 4.17(a) would apply other than to Phaengbutdee and Groupwell. (Joseph Matthews Dep. [DN 153-14] 42-43.) In addition, Matthews testified that he learned Phaengbutdee was Robert Scully's sister-in-law "in the late 2007 time frame." (Id. at 43.) He also confirmed that Robert Scully told him that Phaengbutdee owned Groupwell. (Id. [DN 153-15] 68, 102.)

The Court also notes that the court record in the 2007 Texas state-court lawsuit between the Scullys and their partner in Gourmet, Ken Sliz, also contains significant evidence that Phaengbutdee owned Groupwell, further supporting the Court's finding that the evidence shows that Gourmet did not pay money "by mistake." In specific, a temporary injunction hearing in the Texas case provided testimony that: (1) Phaengbutdee was identified in Groupwell's documents as a director of the company; (2) CEPA was identified as a director of Groupwell in 2007; (3) Phaengbutdee was identified as a director of CEPA—and she was the sole shareholder of that company; and (4) payments from Gourmet that flowed into Groupwell flowed to Phaengbutdee. (See Selected Pages of Transcript from Temp. Inj. Hearing [DN 163-3] 39-40, 44, 57-58, 60.) The Court has already ruled that Gourmet had sufficient information in September 2007 to put it on inquiry of the alleged fraud and any concealment by Groupwell did not prevent Gourmet from asserting its claims at that time. (See Mem. Op. & Order [DN 110] 9-11.) Thus, the Court similarly finds that no reasonable jury could conclude that Gourmet mistakenly believed it was paying an un-related third-party vendor as of January 23, 2008.

The Court notes that Gourmet cites Foster's deposition testimony to argue that Kevin Scully's purchase of food product from Groupwell violated provisions regarding related-party

transactions. However, a close review of Foster's deposition transcript does not support this statement. Foster testified that purchases from the Scullys were authorized as long as they did not violate certain protective provisions of Gourmet's operating agreement. While he stated that some of the protective provisions included related-party transactions, he did not state that the Scullys' purchases violated these provisions. (See Richard Foster Dep. [DN 153-5] 63-64.) There is no evidence that Groupwell was aware of any such restrictions on Kevin Scully's authority. Therefore, the Court finds that Gourmet's money paid by mistake claim must be **DISMISSED**.

### D.     Violation of RICO; Conspiracy to Violate RICO

Gourmet alleges in its counterclaim that Groupwell "did associate with a RICO enterprise of individuals" and that Groupwell "developed a scheme to defraud Gourmet by consistently and systematically inflating the cost of food product paid by Gourmet." (Ver. 2d Am. Ans. to Am. Compl. & Countercls. [DN 49] ¶¶ 82, 84.) Gourmet also alleges that Groupwell "knowingly formed an agreement with and conspired with a RICO enterprise." According to Gourmet, this counterclaim is based on Groupwell's development of a scheme to defraud Gourmet by inflating the cost of food product paid by Gourmet. (Id. ¶¶ 87, 89.) In its summary judgment motion, Groupwell argues that there is no evidence of any "enterprise" occurring after January 23, 2008. (Pl.'s Mem. [DN 153-1] 5, 29-32.) Groupwell also argues that there is no evidence of any alleged "pattern of racketeering activity" occurring after January 23, 2008. (See id.)

Gourmet admits in its response that based on the Court's previous Memorandum Opinion and Order [DN 110], its ability to sustain its civil RICO claims has effectively been precluded. (See Gourmet's Mem. [DN 161-1] 16.) Therefore, the Court finds that Gourmet's civil RICO claims are **DISMISSED**. Because the Court has dismissed all of Gourmet's counterclaims, Groupwell's fourth partial summary judgment motion [DN 153] is **GRANTED**.

In Groupwell's complaint, Groupwell seeks to recover damages from Gourmet for three series of transactions: (1) a claim of $2,959,112.71, plus pre-judgment interest, for goods that Groupwell delivered to Gourmet, for which Gourmet failed to pay Groupwell despite accepting the goods; (2) interest of $4,221.96 on goods that Groupwell sold to Gourmet under the terms of an Escrow Agreement dated October 1, 2009; and (3) damages related to goods that Gourmet agreed to purchase from Groupwell, but which were not delivered to Gourmet because Gourmet cancelled the orders. In its fifth partial summary judgment motion, Groupwell argues that the parties have completed discovery, and Gourmet has provided no evidence to establish a genuine issue of material fact on any of Groupwell's claims. (See Pl.'s Mem. in Supp. of its 5th Mot. for Partial Summ. J. [DN 158-1].) The Court considers each of Groupwell's claims in turn.

### A.      Claim for Goods Delivered to Gourmet

In Groupwell's complaint, Groupwell alleges that Gourmet agreed to purchase certain frozen food items, including vegetables and seafood, from Groupwell. (Am. Compl. [DN 14] ¶ 5.) Gourmet would order goods from Groupwell, and Groupwell would issue an invoice for each order. Pursuant to this course of conduct, Groupwell shipped numerous containers of goods to Gourmet for purchase. (See id. ¶ 6.) On December 18, 2009, Groupwell propounded Requests for Admissions to Gourmet. (See Pl.'s Requests for Admissions Propounded to Def. [DNs 17-2, 17-3, 17-4].) In response to these requests, Gourmet admitted that it ordered the goods described in fifty-five invoices for the agreed price listed in each invoice. (Def.'s Resp. to Pl.'s Request for Admissions Propounded to Def. [DN 17-6] 1-2].) Gourmet also admitted that although the goods were delivered to it, it had not paid Groupwell for those shipments—with the exception of five invoices:  Y9ZSR176  ($27,600.00);  09NLAH4327  ($25,492.52);  MF0904213  ($93,418.25);

SMP-036/09 ($95,465.75); and HS0905-023A ($27,284.32), for a total of $269,260.84. (See id.) Groupwell argues that it is entitled to a summary judgment ruling as to the other fifty invoices. All of the invoices pertain to shipments occurring in 2009. (See Pl.'s Requests for Admissions Propounded to Def. [DNs 17-3, 17-4, 17-5].)

On September 12, 2013, Groupwell deposed Bradley Jackson, Gourmet's current Chief Operating Officer. Jackson confirmed that the goods listed on a document entitled "Gourmet Express Detail Aging Report by Vendor Number" were goods that Gourmet received from Groupwell for which Gourmet had not paid Groupwell. (Bradley Jackson Dep. [DN 153-11] 74-75; Gourmet Detail Aging Report [DN 157].) Jackson confirmed that the document showed that Gourmet owed Groupwell $2,933,853.77. (Id. at 76.) Groupwell thus stipulates for this motion that this is the sum Gourmet owes for the goods Groupwell delivered to Gourmet. (Pl.'s Mem. [DN 158-1] 5-6.) Groupwell asks the Court to award it $2,933,853.77, plus prejudgment interest.

According to Groupwell, partial summary judgment is appropriate on this claim under Article 2 of the Uniform Commercial Code. (Id. at 10-13.) Gourmet has admitted that: (1) the parties agreed that Groupwell would supply goods to Gourmet; (2) the parties agreed on the price for the goods; (3) Groupwell delivered the goods; and (4) Gourmet accepted them. Groupwell argues that based on these admissions, it is clear that a valid contract exists between the parties. K.R.S. § 355.2-204(1) (noting that a contract for the sale of goods can be made in any manner sufficient to show an agreement). Groupwell argues that the fact that there may not be a specific agreement on when payment was due does not result in an unenforceable contract. Id. § 355.2-204(3) (noting that even when one or more terms are left open, a contract for the sale of goods does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy); § 355.2-309(1) (noting that the time

for any action under a contract, if not provided in Article 2 or agreed upon, shall be a reasonable time). Groupwell argues that partial summary judgment is thus appropriate, as K.R.S. § 355.2-607(1) obligated Gourmet to pay the contract rate for any goods accepted. When Gourmet did not pay the contract rate, Groupwell was entitled under K.R.S. § 355.2-703(e) to recover the price of the goods, which was $2,933,853.77. K.R.S. § 355.2-703(e) provides:

> (1) When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under KRS 355.2-710, the price
> (a) of goods accepted . . . .

Id. § 355.2-703(e).

Gourmet responds that Groupwell is not entitled to summary judgment on its claim for delivered goods because "material questions of fact exist so as to require a jury to determine the applicability of Gourmet's fraud defense." (Gourmet's Resp. [DN 161-1] 17.) But as explained earlier, Gourmet has no valid fraud claim. Gourmet's Sixth Defense asserts the defense of fraud and misrepresentation concerning Groupwell's alleged misrepresentation of: (1) the "purchase price for food product" and (2) Groupwell's "true owners, managers and controlling persons." (Ver. 2d Am. Answer to Am. Compl. & Countercls. [DN 49] ¶ 35.) This is the same argument made in Gourmet's counterclaim. The Court has already explained why this claim lacks merit. Groupwell has met its burden of showing that there is no genuine issue of material fact as to any fraud occurring after January of 2008—and Gourmet has not presented any evidence to dispute this showing. The Court enters summary judgment for Groupwell in the amount of $2,933,853.77.

### B.    Claim for Damages related to Escrow Agreement

In the fall of 2009, Groupwell and Gourmet negotiated a method by which Groupwell would receive payment for goods in transit to Gourmet, along with partial payment for some goods already delivered to Gourmet. The parties signed an Escrow Agreement dated October 1,

2009 memorializing this arrangement. (See Am. Compl. [DN 14] ¶ 10.) Groupwell alleges that while Gourmet ultimately paid it for the goods under the Escrow Agreement's terms, Groupwell sustained damages due to Gourmet's failure to pay for the goods as originally agreed by the parties. Groupwell thus seeks interest on each shipment from the date payment was due to the date of actual payment, as well as costs associated with the preparation and administration of the Escrow Agreement. Groupwell asserts that the interest amount is $4,221.96. (Pl.'s Mem. [DN 158-1] 7.)

As evidence of its alleged damage, Groupwell argues that the parties had an agreement that payment was due no later than fourteen days after the shipment cleared U.S. Customs. In this respect, Groupwell highlights the affidavit of Didier Delaval, who stated that payment was due from Gourmet "within 14 days after Gourmet received the shipment when it cleared United States Customs, as noted by the category [on outstanding payment schedules] 'Over 14 Days' . . . ." (Didier Delaval Aff. [DN 27-2] ¶ 6.) Groupwell also highlights the affidavit of Nataporn Phaengbutdee, who stated that Groupwell delivered several shipments to Gourmet, as indicated in "Exhibit A." Exhibit A shows ten shipments delivered pursuant to the Escrow Agreement, with the "Due Date" column showing the dates Gourmet was required to pay Groupwell for each shipment. (Nataporn Phaengbutdee Aff. [DN 158-2] ¶3, Ex. A.) The "Due Date" column for the shipments lists dates that are fourteen days beyond when the goods were estimated to clear U.S. Customs in Chicago. (See id. (listing an additional column entitled "ETA Chicago," which contains dates for each shipments that are fourteen days prior to the dates listed in the "Due Date" column).) Groupwell argues that Gourmet has not, and cannot, produce any evidence that this fourteen-day payment schedule was not the parties' agreement.

As to this issue, Groupwell notes that the only Gourmet representative who knew the payment terms between Groupwell and Gourmet was Kevin Scully, who was in charge of day-to-day operations at Gourmet until his employment was terminated in late July 2009. (Thomas Moreno Dep. [DN 153-8] 14-16.) Based on his Fifth Amendment rights, however, Kevin Scully did not answer any questions when Gourmet deposed him in this case—and he died on June 23, 2013. Groupwell argues that in light of Kevin Scully's lack of testimony, Gourmet cannot produce any evidence suggesting that payment was due other than fourteen days after the shipment cleared U.S. Customs. (See Pl.'s Mem. [DN 158-1] 12.) Groupwell argues that when a breach consists of a failure to pay a definite sum in money, as is the case here, interest is recoverable from the time for performance on the amount due. Nucor Corp. v. Gen. Elec. Co., 812 S.W.2d 136, 144 (Ky. 1991) (citation omitted). Groupwell states that because no interest rate is specified, KRS § 360.010(1) applies, which provides for an interest rate of 8% per annum. Travelers Prop. Cas. Co. v. Hillerich & Bradsby Co., Inc., 596 F. Supp. 2d 1020, 1025 (W.D. Ky. 2008). Thus, Groupwell argues that it is entitled to $4,221.96, being the interest at the legal rate of 8% per annum, from the due date for Gourmet's payments until the actual payment dates. Groupwell also seeks prejudgment interest, compounded annually on this sum.

Gourmet's response is somewhat unclear with respect to Groupwell's argument that the parties agreed that payment was due no later than fourteen days after the shipment cleared U.S. Customs. On the one hand, Gourmet seems to argue that the parties' agreement was that payment was due no later than thirty days after the shipment cleared U.S. Customs. In this light, Gourmet points to Thomas Moreno's deposition testimony, in which Moreno stated that to the best of his knowledge, Gourmet was supposed to pay Groupwell invoices within thirty days of Gourmet receiving the goods. (Id. at 29-30.) Moreno stated that his knowledge was based on the fact that a

thirty-day payment schedule was the usual and customary practice of Gourmet and several of Gourmet's suppliers. (Id. at 30.) Groupwell highlights, however, that Moreno also stated that he had no knowledge regarding the specific payment practice between Groupwell and Gourmet. (Id.) According to Groupwell, Moreno's testimony is thus insufficient to refute Groupwell's proof.

On the other hand, Gourmet argues that "[c]learly there was no agreement between Gourmet and Groupwell as to when payment for goods was due, as such a material issue of fact exists." (Gourmet's Resp. [DN 161-1] 19.) In this respect, Gourmet argues that there "is a material issue of fact" as to whether "Gourmet paid Groupwell at a later date for goods than the agreed date of payment." (Id. at 18.) Gourmet argues that following the Scullys' removal from Gourmet, Groupwell unilaterally altered the parties' previous course of conduct, insisting that Gourmet pay for goods prior to their receipt. (See Bradley Jackson Dep. [DN 153-12] 106 (noting that he recalled discussions about "paying for [goods Gourmet was] about to get" or paying for "an order that had been on the water"). Gourmet states that Groupwell cannot show that there was ever an agreement between the parties that Gourmet would pay for the goods prior to their delivery to Gourmet. Gourmet states that the evidence is to the contrary, especially in light of the fact that Didier Delaval had no role in the ordering of products, as Phaengbutdee states that she was the person who took orders and negotiated payment terms. (See Nataporn Phaengbutdee Dep. [DN 153-30] 135.) According to Gourmet, without a definitive date for when payment is due, Groupwell is not entitled to interest for a "late" payment, as any payments cannot be considered late. (See Gourmet's Resp. [DN 161-1] 19.)

Groupwell responds that if Gourmet has sufficiently contested that there was a different agreement between the parties on the payment due date, K.R.S. § 355.2-310(1) should apply. This section provides that unless otherwise agreed, "[p]ayment is due at the time and place at

which the buyer is to receive the goods even though the place of shipment is the place of delivery . . . ." K.R.S. § 355.2-310(1). Groupwell states that if Gourmet disputes Groupwell's position on the date of payment, then payment was due on delivery, which is an earlier date.

The Court finds that in this case, the evidence shows that the parties had an agreement that payment was due no later than fourteen days after the shipment cleared U.S. Customs. Groupwell met its burden of demonstrating the absence of a genuine issue of material fact on this issue through the affidavits of Didier Delaval and Nataporn Phaengbutdee, and the Court finds that Gourmet did not meet its subsequent burden of producing specific facts demonstrating a genuine issue of fact for trial. In the light most favorable to Gourmet, the evidence only shows that Gourmet, as well as some of its suppliers, customarily used a thirty-day shipment schedule. Far from creating a genuine issue of material fact, this evidence is merely a "scintilla" in support of Gourmet's position. From it, a reasonable jury could not find that a thirty-day shipment schedule existed between Groupwell and Gourmet. Accordingly, the Court holds that Groupwell is entitled to summary judgment with respect to its request for $4,221.96 of interest, as well as costs associated with the preparation and administration of the Escrow Agreement.

### C.     Claim for Cancelled Orders

Groupwell argues that in addition to goods already delivered to Gourmet by Groupwell, Gourmet agreed to purchase goods in the future from Groupwell pursuant to a shipping schedule. Groupwell cites the testimony of Didier Delaval as evidence of this agreement. Delaval stated that the schedule was an Excel spreadsheet with "heaps of orders" that were confirmed by Kevin Scully at Gourmet. (Didier Delaval Dep. [DN 153-22] 77.) Nataporn Phaengbutdee stated in her deposition that Kevin Scully provided the schedule to her, from which she negotiated with her suppliers for the best price and then negotiated with Kevin Scully for the sales price to Gourmet.

(Nataporn Phaengbutdee Dep. [DN 153-30] 135.) Eduardo Arevalo, one of Gourmet's employees, confirmed that the schedule was created by Kevin Scully. (Eduardo Arevalo Dep. [DN 153-18] 94-103.)

Groupwell argues that on or about November 18, 2009, Gourmet informed Groupwell that it did not intend to purchase additional goods from Groupwell, despite the fact that goods had already been ordered pursuant to the Excel shipping schedule. Groupwell states that it was able to cancel all of the orders placed with its suppliers except for three shrimp orders placed with SMP Food Products, Co., Ltd.: purchase orders 52SH118, 52SH119, and 52SH120, in the amount of $93,440.00 each, for a total of $280,320. (See Nataporn Phaengbutdee Aff. [DN 158-2] ¶ 5, Ex. B.) Groupwell seeks summary judgment with respect to the price for these three shrimp shipments. In addition, Groupwell seeks its lost profits on the other sixty-four orders it cancelled, which totaled $331,080. (Id. ¶¶ 5-6.) Groupwell seeks prejudgment interest from July 1, 2010, which is the date, according to the schedule, that Groupwell anticipated delivering the goods and receiving payment from Gourmet. (See Pl.'s Mem. [DN 158-1] 9.)[3]

According to Groupwell, Gourmet cannot dispute that it placed the subject orders, as they are reflected on a document that Eduardo Arevalo, one of Gourmet's employees, has admitted was prepared by Gourmet. (See Eduardo Arevalo Dep. [DN 153-18] 93.) Groupwell states that it has also established that it accepted these orders from Gourmet and ordered the goods from its suppliers. (See Nataporn Phaengbutdee Aff. [DN 158-2] ¶ 4.) Groupwell thus turns to K.R.S. § 355.2-703 to argue that the Court must enter summary judgment in its favor for Gourmet's cancelled orders. K.R.S. § 355.2-703 provides:

---

[3] The Court notes that Groupwell specifically does not seek recovery of prejudgment interest from the date that each payment was due. Instead, Groupwell starts the running of prejudgment interest for all orders on July 1, 2010. (See Pl.'s Mem. [DN 158-1] 9 n.3.) However, Groupwell states that if the case goes to trial on this claim, it "will compute prejudgment interest on each order from the date payment was due on each order." (Id.)

> Where the buyer . . . repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (KRS 355.2-612), then also with respect to the whole and deliberate balance, the aggrieved seller may . . .
>
> (e) recover damages for non-acceptance (KRS 355.2-708) or in a proper case the price (KRS 355.2-709).

Id. § 355.2-703. Groupwell also directs the Court's attention to Comment 2 of K.R.S. § 355.2-708, which notes that a seller's normal measure of damages for repudiation is the list price, less the cost to the dealer. Groupwell argues that this is what it seeks to recover here, as it seeks $331,080.00, which is the difference between the price it charged Groupwell and the price it paid its suppliers. (See Nataporn Phaengbutdee Aff. [DN 158-2] ¶ 6.)

Further, in regard to Groupwell's request for the price of the three shrimp orders that it could not cancel, Groupwell turns to K.R.S. § 355.2-709. This section provides:

> (1) When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under KRS 355.2-710, the price . . .
>
> (b) of goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing.

Id. § 355.2-709. Comment 2 to this section states that an action for the price is generally limited to those cases where resale of the goods is impracticable. Here, Groupwell states that it has provided evidence to show that the resale of the goods was impracticable, as the shrimp it bought for Gourmet were specifically processed and packaged according to specifications provided by Gourmet. (Nataporn Phaengbutdee Aff. [DN 158-2] ¶ 5.) Groupwell states that because the shrimp were specially packaged, they could not be resold to other companies. (Id.) Therefore, Groupwell argues that it is entitled to recover the full price of the three loads of shrimp, which is $280,320.00. It asks the Court to enter partial summary judgment in its favor for that amount.

Gourmet counters that summary judgment is not warranted on Groupwell's claim for the cancelled orders, as the evidence shows that Groupwell was not obligated to supply goods to Gourmet until Gourmet issued a purchase order. (<u>See</u> Gourmet's Resp. [DN 161-1] 19.) In this respect, Gourmet argues that the record "clearly establishes that no long-term supply agreement existed between Gourmet and Groupwell for goods in 2009." (<u>Id.</u>) Gourmet cites to the deposition testimony of Eduardo Arevalo, who indicated that Gourmet ordered goods at the time it issued a purchase order. (Eduardo Arevalo Dep. [DN 153-17] 33-34.) Gourmet also cites to the deposition testimony of Didier Delaval, who stated that it was his understanding that Gourmet would send a purchase order to Groupwell. (Didier Delaval Dep. [DN 153-22] 84.) Finally, Gourmet cites the deposition testimony of Nataporn Phaengbutdee, who admitted that Kevin Scully did not affirmatively commit to purchase goods until the parties agreed on pricing terms and he submitted a purchase order. (Nataporn Phaengbutdee Dep. [DN 153-30] 135.) Gourmet states that this evidence shows that "at no time was Groupwell obligated to supply goods to Gourmet, nor was Gourmet obligated to pay for any goods, until Gourmet issued a purchase order." (Gourmet's Resp. [DN 161-1] 19.) Gourmet states that Groupwell had no reasonable expectation that Gourmet would order goods, as there was no long-term supply agreement or contract.

In addition, Gourmet states that the Excel spreadsheet did not rise to the level of a contract, as no pricing terms are contained on the spreadsheet—and the spreadsheet could have been altered by either party. (<u>See id.</u> at 20.) Finally, Gourmet states that there are material issues of fact as to the amount of any lost profits Groupwell suffered on its cancelled orders. As to this argument, Gourmet states that absent a long-term supply agreement or other mechanism for determining price, Groupwell cannot establish the measure of its lost profits. Gourmet notes that during her deposition, Phaengbutdee was not able to specifically identify the methodology she

used to compute her lost profits with any particular specificity. Instead, she stated that she anticipated a profit of 10% return of "turnover," i.e. the 10% profit on the total price of the goods. (Nataporn Phaengbutdee Dep. [DN 153-34] 13-16.)

The Court agrees with Groupwell that there is no genuine dispute of material fact with respect to Gourmet's cancelled orders—and Groupwell is entitled to summary judgment. In defense to Groupwell's claim for goods ordered (and cancelled) by Gourmet, Gourmet cites the testimony of Arevalo about the ordering process between Gourmet and Groupwell. However, as Groupwell notes in its reply memorandum, Arevalo stated in his deposition testimony that he never communicated with anyone from Groupwell. (Eduardo Arevalo Dep. [DN 153-17] 23.) His only involvement was cutting purchase orders from Kevin Scully, who was the Gourmet employee who had contact with Groupwell. (See id. at 34-35.) Arevalo stated that he was not aware on any limit on Kevin Scully's authority to order goods from Groupwell. (Id. at 38-39.) He also stated that he was not aware of negotiations with anyone affiliated with Gourmet and anyone affiliated with Groupwell regarding the price or other terms of purchasing goods from Groupwell. (Id.) Therefore, the Court finds that he lacks personal knowledge of the facts at issue.

Moreover, contrary to Gourmet's claim, the Court finds that the undisputed evidence shows that Kevin Scully provided Groupwell with a schedule of goods that Gourmet needed. Arevalo confirmed that the schedule was prepared by Gourmet. This schedule was the contract between the parties. Delaval confirmed that the schedule "was the basic fundamental . . . of the contractual relationship." (Didier Delaval Dep. [DN 153-22] 76.) He stated that Groupwell and Gourmet "had this schedule, and this schedule was considered as the . . . schedule of deliveries with commitments from Gourmet to procure, which was making life possible for everyone because . . . the seafood could be ordered [a] long time in advance to get the quality, to get the

quantity, and to get the right product at the right time at the right place." (Id. at 77.) Further, he stated that it was an "Excel schedule with . . . heaps of orders," and that "every time there was need for activation of an order, the instructions were confirmed by Kevin Scully to Nataporn . . . ." (Id.) Phaengbutdee, in her affidavit, states that Kevin Scully ordered all of the sixty-seven listed orders, which are the basis of Groupwell's claim. (Nataporn Phaengbutdee Aff. [DN 158-2] ¶¶ 4-5.) The Court finds that Gourmet has not met its burden of proving that a genuine issue of material fact exists concerning these orders.

The Court notes that Gourmet does not dispute the law cited by Groupwell that entitles it to recover on both: (1) the three shrimp orders that were specially processed and packaged for Gourmet; and (2) the remaining orders that were cancelled by Gourmet. Further, a review of her deposition testimony shows that Phaengbutdee did not state that the spreadsheet schedule could be altered by Groupwell. Instead, Phaengbutdee indicated that she had to call Kevin Scully if changes needed to be made. (See Nataporn Phaengbutdee Dep. [DN 153-31] 140-41.) Further, Gourmet cites Phaengbutdee's testimony that she anticipated a profit or "turnover" of 10% and complains that she could not describe how she computed this number. Contrary to Gourmet's claim, however, Phaengbutdee did not fail to identify the methodology of her computation. Instead, she based in on Groupwell's "accounting" information and Groupwell's "ledger book." (Nataporn Phaengbutdee Dep. [DN 153-34] 12-16.)

Groupwell notes in its reply that Phaengbutdee's deposition estimate is very close to the actual damages sustained by Groupwell. In this respect, Groupwell cites in its reply Exhibit C to Phaengbutdee's affidavit. It states that the total price that Groupwell charged Gourmet is $3,224,780, and Groupwell's "Gross Margin" (or net profit) is $357,000, which is 11% of the Gourmet price. (See Nataporn Phaengbutdee Aff. [DN 158-5] Ex. C.) Groupwell highlights that

when eliminating the three shrimp orders totaling $280,320.00 for which Groupwell seeks the price as damages, Exhibit C has a Groupwell price to Gourmet of $2,944,460 and a Groupwell "Gross Margin" of $331,080, which is 11% of the Gourmet price. While Gourmet argues that Exhibit C "does not contain independently verifiable sources for the documentation she used to make her calculations," (Gourmet's Resp. [DN 161-1] 20), the Court finds this is incorrect. Phaengbutdee verified these calculations in her affidavit. (See Nataporn Phaengbutdee Aff. [DN 158-2] ¶ 2.) Also, the sources are independently verifiable, as the price per pound in Exhibit C is identical to the price per pound for these goods charged by Groupwell in 2009. (See Invoices [DNs 17-3, 17-4, 17-5].) Further, if Gourmet believed the prices to not be accurate, it should have produced documents in its response to Groupwell's summary judgment motion to show the inaccuracy. In sum, the Court finds that there is no genuine issue of material fact regarding proof of Groupwell's damages. Summary judgment is proper in Groupwell's favor as to Gourmet's cancelled orders. The Court accordingly grants summary judgment in the amount of $280,320 for the three shrimp orders that Gourmet could not cancel. It also grants summary judgment in the amount of $331,080 as lost profits for the other sixty-four orders that Groupwell cancelled.

### D. Prejudgment Interest

As noted above, when a breach consists of a failure to pay a definite sum in money, interest is recoverable from the time for performance on the amount due. In this case, no interest rate is specified. Therefore, K.R.S. § 360.010(1) applies, which provides for an interest rate of 8% per year. The trial court has discretion to award compound interest at 8%. See, e.g., Travelers Property Cas. Co., 596 F. Supp. 2d at 1025); W. Ky. Royalty Trust v. Armstrong Coal Reserves, Inc., 2013 WL 3776494, at *2 (W.D. Ky. July 17, 2013) (awarding prejudgment interest at 8% compounded annually).

Groupwell argues that the circumstances of this case warrant compounding the interest annually. In this respect, Groupwell cites Reliable Mech., Inc. v. Naylor Indus. Servs., Inc., 125 S.W.3d 856, 858 (Ky. App. 2003). In that case, the Kentucky Court of Appeals noted that the defendant deprived the plaintiff of the use of money it rightfully owed for nearly eight years. The Court held that awarding compound interest was "an equitable means of recognizing the economic reality that Reliable has enjoyed a long opportunity to earn interest on the money that it wrongfully withheld from Naylor." Id. at 858. Groupwell argues that similarly, in this case, Gourmet has used the approximately $3 million it admittedly owed Groupwell to fund its own operations. According to Groupwell, Gourmet has "furthered its own interests at the expense of Groupwell." Further, "Gourmet's failure to pay Groupwell caused Groupwell to cease business and thwarted its owner's attempts to start any other business. Gourmet has caused Groupwell to engage in lengthy and expensive litigation to attempt to recover this admittedly due money." (Pl.'s Mem. [DN 158-1] 20.)

Gourmet does not dispute Groupwell's cited authority regarding the compounding of interest annually. Instead, Gourmet argues that "at a minimum, [the Court] should not award pre-judgment interest for the period of time that Groupwell requested a stay in discovery." (Gourmet's Resp. [DN 161-1] 20.) The discovery period for Gourmet's substantive claims and counterclaims was governed by the Scheduling Order entered on May 1, 2013. (Order [DN 133].) In an order entered March 14, 2012, the Court prevented Gourmet from conducting any discovery that was not related to a previous Settlement Agreement. (Order [DN 83].) Gourmet argues that prejudgment interest should not be awarded for the period of time between March 14, 2012 and May 1, 2013 because the bifurcation of issues and stay in discovery extended the life of this litigation at Groupwell's request. (Gourmet's Resp. [DN 161-1] 20-21.)

Gourmet, however, cites no legal authority to support its position that the Court should not include the period of time during which Groupwell bifurcated discovery. The Court finds that accepting Gourmet's position is unwarranted. In this case, the Court granted the stay to avoid the expense associated with litigating Gourmet's counterclaims and defenses based on conduct that occurred before January 2008. At any time during the pendency of this litigation, Gourmet could have stopped the running of this interest by paying Groupwell what it admittedly owed. Instead, it kept the money and used it to fund its own operations. Kentucky law is clear that a court shall award prejudgment interest at 8% on liquidated sums from the time of performance. Further, the Court finds that the circumstances warrant compounding the interest annually. The Court awards Groupwell prejudgment interest at 8%, compounded annually, on the following sums: (1) $2,933,853.77 on Groupwell's claim for goods delivered, from August 1, 2009 to the date of judgment; (2) $4,221.96 on Groupwell's claim for damages related to the Escrow Agreement, from November 9, 2009 to the date of judgment; (3) $280,320 on Groupwell's claim for Gourmet's three cancelled shrimp orders, from November 1, 2009 to the date of judgment; and (4) $331,080 on Groupwell's claim for lost profits with respect to Gourmet's sixty-four cancelled orders, from July 1, 2010 to the date of judgment.

### E. Final and Appealable Order

Finally, Groupwell argues that the Court should hold that any partial summary judgment entered is a final and appealable judgment under Fed. R. Civ. P. 54(b). (See Pl.'s Mem. [DN 158-1] 21.) However, because the Court has granted Groupwell's fourth and fifth motions for partial summary judgment, the Court has resolved all the issues in this case. Accordingly, a final judgment will be entered.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Plaintiff's Fourth Motion for Partial Summary Judgment [DN 153] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Fifth Motion for Partial Summary Judgment [DN 158] is **GRANTED**.

**FURTHER** that Plaintiff's Motion for Leave to File Reply Brief in Excess of 15 Pages [DN 163] is **GRANTED**.

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

June 11, 2014

cc: counsel of record